So, good morning, Your Honors. My name is Tamar Weinreb from Pomeranz LLP on behalf of the Plaintiff Appellant here. And this is a Section 14a case, and it's about defendant's dissemination of a proxy with misstatements to solicit shareholder approval of a deficient per-share merger price for which they agreed to sell Avalara to Vista. The misstatements, which were to convince investors that Avalara faced substantial risk to continuing as a standalone entity, directly contradicted Avalara Senior Executive's public statements on earnings calls and during an Analyst Day presentation, which conveyed significant optimism backed up by hard data regarding the company's prospects as a standalone entity. We're here because the District Court committed reversible error in granting defendant's motion to dismiss the amended complaint, which I'll refer to today as the SAC. But we'll start with what the court got right. Let's jump in with the good. First, the District Court was correct in ruling that the SAC alleged subjective falsity as to defendant McFarlane. The District Court was correct in ruling that the PSLRA Safe Harbor does not apply to any of the misstatements. And the District  foundational fraud and transactional causation. Now we'll turn to what the District Court got wrong. The District Court committed reversible error by drawing inferences and resolving factual disputes in defendant's favor to rule that there was no... Sorry for interrupting, but there's one... you're getting to what the District Court got wrong. So, there's one allegedly misleading potential inorganic growth. The District Court analyzed that and said that there's... I'm looking at the District Court's order. As the proxy discloses, there were no acquisitions in the near or the long-term horizon because by late June, any hopes of acquiring Company A had essentially dissipated. And so, the District Court didn't even talk about the quarterly reports and said that those were just quarterly guidances and not a long-term projection. What's wrong with that analysis? Thank you, Your Honor. So, the District Court erroneously held that based on flawed premises. And as you correctly stated, the District Court said that it was justifiable that Avalara did not include inorganic growth in the guide because it states in the proxy that they had determined not to acquire Company A. And also that it states that the board reviewed potential strategic acquisitions. But nowhere did the proxy state that Avalara no longer planned to engage in any M&A activity whatsoever. And in fact, those two statements are somewhat irrelevant to that analysis because we know from the very press release that announced the merger that Avalara did, in fact, intend to continue pursuing M&A activity. They said as such also on prior earnings calls and during Analyst Day, they made clear that M&A was part of the company's DNA and also a very big part of its business strategy in growing internationally. Right. But at that point, any potential acquisition was too speculative or hypothetical as the District Court put it? Your Honor, the proxy only addresses the potential acquisition of one entity and doesn't state that there were no other potential acquisitions coming in the future. Moreover, when crafting projections, organic or inorganic, it's all hypothetical. None of it is a guarantee. It's all based on currently held reasonable assumptions. And previously, the company had always included potential inorganic growth in its guidance and previously had only issued quarterly guidance. And that quarterly guidance always included inorganic growth. So even if we want to say that it was justifiable for them to omit inorganic growth for argument's sake, let's say, you know, the District Court was right and, you know, the company made clear it didn't have any prospects and therefore it was justified. It wasn't justified in not pointing out that omission, though. Given its historical practice, given that it had always included inorganic growth, investors would have reasonably anticipated that these projections similarly included both organic and inorganic, but that distinction was not made. Nowhere did the proxy disclose that the May or July projections focused on organic growth alone. And again, even that is hypothetical. Projections by definition are hypothetical. We don't know until they materialize later on whether they were right, whether they were wrong. By nature, they are hypothetical. And, Your Honor, the District Court also stated three times in its opinion, it conceded three times that if Avalara plans to continue M&A activity and did not include any inorganic growth in the projections, that their statements regarding whether the projections were prepared on a reasonable basis and whether they reflected best currently available estimates and judgments that they would have been false and misleading. But we know for a fact that Avalara did plan to continue M&A activity because they stated as such as late as the press release announcing the merger. In that press release, they stated that they intended to continue pursuing value accretive M&A going forward, which makes sense considering what a big part of its growth story it had been up until that point. So, aside from the projections, Your Honor, which were objectively false for the reasons just stated, and while I'll address subjective falsity now since we're on the projections as well, and similarly make the point that the court should have only done a subjective and objective falsity analysis with regard to the projections. It's only relevant with regard to either statements of opinion or projections, but then erred in applying that standard to all the misstatements. But focusing again just on where we are now, we just covered objective falsity, but the court also erroneously concluded that there was no subjective falsity or negligence as to the projections, and the court actually analyzed them both simultaneously, so I will do the same. But when the court stated there was no subjective falsity, it didn't include any supporting analysis. It stated in a conclusory fashion that even though there was subjective falsity as to Defendant McFarlane, and even though the district court conceded that Defendant McFarlane transmitted all the same data that he possessed, all that same data that underpinned the finding of subjective falsity as to him, transmitted that to all the remaining director defendants during nine separate meetings that were covered in the proxy, for some reason the court then ruled nevertheless there's no subjective falsity as to those remaining defendants, but provided no reason why. Given that the director defendants and Defendant McFarlane all possess the same information, the same ruling should have applied to both Defendant McFarlane and the remaining director defendants. Now aside from the projections themselves, the SAC also alleges that defendant statements were false when they stated that they prepared the projections on a reasonable basis, that they reflect best currently available estimates, and presented to the best of management's knowledge and belief the expected financial performance of Avalara, and they were false because underpinning those statements were purported short-term risks and challenges that directly contradicted statements that management made during the same time frame on earnings calls and on Analyst Day. Taking each of these risks and challenges in turn will start with upsell growth. The court based its rejection of allegations regarding upsell growth on a false premise, which was that nothing in plaintiff's brief or the SAC shows that the company did not need new bookings in the first quarter of 2022 because upsell growth was so strong, but they did in fact state that, and that quote is included in paragraph 114 of the SAC. It's a quote from the first quarter of 2022 earnings call where management stated quote, we didn't need somebody to sign up for e-commerce this quarter to produce the bookings. That means we did not need new bookings, and they provide the reason for this in the next statement, which is we are monetizing through conversion and upsell. In other words, upsell growth was strong enough that they did not need new bookings for the quarter. The district court also held that any optimistic statements made during earnings calls or on Analyst Day about upsell growth were simply puffery, focusing on phrases like healthy expansion and good momentum. But what the district court didn't acknowledge erroneously is that those phrases were tied inextricably to metrics. They were on the exact same slides. The phrase healthy expansion referred to 25% year-over-year growth, good momentum referred to NRR of 116%, the highest since they had reported that metric, and defendants don't dispute this. They don't dispute that the phrases were used with numerically specific metrics. Ms. Weinreb, does that include the statements about the impact of lost business from the, I think the European partner, wasn't it the European partner, partner A? Thank you, Your Honor. Yes, that's one of the other risks and challenges that was noted, and I'm happy to address that next. One of the other risks and challenges that they used to justify downward revisions to the July projections and to justify the deficient per share merger price was that they said they were factoring in lost revenue from this partner A. The district court erroneously rejected allegations that loss of the partner A revenue did not justify those revisions to the July projections, though crediting allegations that management had previously made clear this revenue loss would not have any meaningful impact on future revenue growth. The district court didn't address that per the proxy. The proxy makes this clear. The same management that stated that this loss of revenue would not be indicative of future growth also crafted the projections and already contemplated the winding down of that revenue when they put the May projections together. The court also- There was some emphasis on the matter of the general challenges in the international market as a total, were there not? No, Your Honor. They were specifically referring to the loss of revenue from partner A. In fact, one of the things that the district court disregarded was the fact that Avalara management had made clear that not only was this loss of revenue insignificant but was also offset by tremendous strength in the EU business because Avalara had already signed 1,200 EU partners and expected a $20.5 billion total addressable market due to government mandates and e-invoicing by 2025, both of which would have more than offset the minimal loss of revenue contemplated with regard to partner A. Another risk and challenge aside from the upsell growth and partner A was with regard to macroeconomic risk. The district court acknowledged that Avalara told investors it was well-positioned to face macroeconomic downturn but stated that it found no prior statements suggesting there would be no impact from a downturn. Those statements, however, are also in paragraph 114 of the SAC, which makes clear that due to the nature of Avalara's business model, which is the filing of tax and compliance documents which have to be filed no matter what the macroeconomic conditions are, that Avalara did face macroeconomic risk. Defendants don't dispute that they told investors that Avalara's business model was proven resilient and therefore would suffer no impact. Instead, they say that it's puffery. But they didn't just state their business model was resilient. They said it was proven resilient. And they backed that statement up with hard metrics. More than 90 percent of their revenue was earned from subscriptions, 60 percent of that from tax calculation products, and 40 from tax returns and compliance management products, none of these which are services that ebb and flow with the macroeconomic tide. Another weakness that they referred to was potentially a decrease in regulatory compliance. However, that directly contradicted statements that were made, including statements by Defendant McFarlane that by 2025, 80 percent of organizations would be forced by legislation or trading partners to exchange invoices in electronic format. The district court erroneously stated those statements couldn't support falsity because they were statements of expectation. But that's wrong for three reasons. One, statements of expectations can still be false and misleading. If that weren't the case, securities fraud cases could never be premised on false projections or forecasts. Second, Defendant McFarlane didn't state this as a hypothetical expectation. It was made as a statement. And third, Defendant McFarlane's statements demonstrate that executives cannot have simultaneously held a dueling expectation that regulatory compliance would decrease. It had to be one or the other. Defendants don't respond to this argument at all. They say that instead that a decrease could negatively impact Avalara. But that misses the point because they didn't expect any such decrease. They also argue for the first time that they reduced compliance complexity. First of all, that argument is waived because they didn't raise it below. But in any event, that's not what the proxy stated. I didn't state a reduction in compliance complexity. And an Analyst Day presentation actually stated the converse, which is we expect international complexity created by e-invoicing to be a major growth driver. I see I am less than a minute to my time expiring. If there are other aspects of the weaknesses that Your Honors would like me to address, I'm happy to do so. We also didn't address loss causation, though, again, that was not an issue the district court passed upon below and is therefore not properly before this court. But if there are any questions with regard to that, I'm happy to address them. Yeah, I have no questions. Okay. And there was one other weakness also that we didn't address, which was with regard to the second quarter of 2022 results, which I'm happy to address now or I can do so on rebuttal. Okay. I think you should probably can't hold on to rebuttal. Thank you, Your Honors. And now your time is basically up a few seconds, but I'm going to add two minutes to your clock for rebuttal. Thank you very much, Your Honors. You can plan on that. Thank you. Now we'll hear from the appellee. If the appellee wants an extra two minutes to oppose, we give the appellee that. Thank you, Your Honor. And Your Honors, may it please the court, Jay Lefkowitz from Kirkland & Ellis for Avalara. And I apologize if I cough a little bit. I developed this RSV virus last week. I want to, there are a lot of issues in this case, but I think fundamentally the trial judge after reviewing two different motions to dismiss on two different complaints found that there was simply no falsity. And I think, although there are a lot of issues in terms of safe harbors and loss causation, I think I just, the best way of using the time today is to respond directly to what addressed. And I want to start with the inorganic growth points that Judge Wynn asked about. The plaintiffs essentially are arguing that the proxy is false because it doesn't include purely speculative revenues. I would suggest that a company would get into a lot of trouble if it were forecasting hypothetical revenues from hypothetical transactions. There's simply no example that plaintiffs offer of a non-consummated transaction that was ever incorporated into Avalara's projections or a transaction that was on the horizon that they were about to enter into, like in the NECA IBEW case that they rely on. What they say is that the proxy is false. And they claim that Avalara always included inorganic growth when issuing guidance. But that's not true. And in fact, if you look at what they cite when they rely on this at SCR 24, they cite a earnings call where the CFO of the company said, and on the second question, is there inorganic growth in the guide? The guide does incorporate all acquisitions, including acquisitions we did in 2021. The plaintiffs omit those last six words in their complaint at paragraph 95. The last six words clearly show this is referring to completed acquisitions. And then at SCR 608 in the earnings call, they explain that Avalara's policy is that it's not going to call out inorganic growth specifically every quarter, although it explains that it did identify one merger in the public guidance because it had already occurred. So, I would suggest that there's simply no falsity on that. I'd like to move to the next issue she raised, which was the slower than expected growth. And the fact of the matter is the company did experience slower growth than it expected. In prior years, it had been running at a 30 or a 35% rate of increase. This quarter, they said we had 25% upsell growth. And while upsell growth is good, it doesn't satisfy for not getting new clients. You might do well in a particular quarter when you get upsell growth from your existing e-commerce customers, which is exactly what they said. But again, to say that most bookings have come from prior customers activated on e-commerce says nothing about whether bookings are doing well overall. Avalara could and in fact did experience slower than expected growth in Q1. It's like hitting a double when you want to get up and hit a home run. It doesn't mean it's bad, but it's certainly not what you expected or what you hoped for. And in fact, Avalara is very clear. It said in the Q1 earnings call, we still have work to do. And when it said we didn't need somebody to sign up for e-commerce this quarter to make a profit, that actually implies that they weren't getting sufficient new customers. So I don't think there's any question of falsity there. I want to address a couple of other issues. So before you move on to other issues and run out of time, can I have you go back to the projection, including inorganic growth? I just want to make sure that I understand your argument. You're trying distinction between the quarterly guidelines and the actual projections. That's what your argument is based on, because there are plenty of statements, even subsequent by Tenenbaum, for example, that talks about how important M&A is to the growth of the company and that it's like embedded in the DNA. You can see that from prior years of the acquisition come through. So is your argument then, OK, the guidelines can take into account the inorganic growth, but when it comes to projections, it's never included unless an acquisition is either completed or it looks like it's going to materialize? That is exactly right. It's perfectly fine for a company to talk about itself and to say, M&A is in our DNA. We're always trying to acquire companies. I think all companies at a certain level are trying to always grow organically and inorganically. And whether you call it puffery or not, that's not the statement in the proxy that they're saying is misleading. What they're saying is misleading in the proxy is that the proxy doesn't include revenue projections for acquisitions that haven't happened. And number one, I think it would be irresponsible to do that. And number two, there's no evidence that Avalara ever did that once in its history. It only ever included numbers based on acquisitions that had been completed. And so it is clearly not false to put out projections that don't include hypothetical transactions with hypothetical partners. In fact, the proxy even discloses that there had been some potential partners on the horizon and those deals didn't materialize. If I can move on, Your Honor? Yes. Can I have you address the ISS views about the sale? There was an alternate recommendation to sell, but at the same time, there were just a lot of cautionary admonitions in there. So the district court said that that particular statement wasn't false because parts of the information is available elsewhere. And that appears contrary to our circuit case law. I'm not sure that we require misleading statements or that we allow misleading statements to be cured when investors can scour documents available to the public elsewhere. So can you address that? Yes, I can, Your Honor. They're essentially saying that it was false or misleading. In point of fact, ISS did make a recommendation in favor. And so it is not false or misleading to say they recommend it in favor. I think their argument is that it was misleading because we didn't identify any of the cautionary notes that ISS put on the record. But, of course, there's no question that they were all presented to the shareholders because Altair filed in exactly the same proxy. They filed their own 14A and they identified very specifically some of the statements that were negative and cautionary where they said. Mr. Lefkowitz, that was in a separate SEC filing, correct? Correct. But it went to the shareholders. As I understand, with respect to that, that a separate information and a separate SEC filing does not render other statements not being false or misleading because it was omitted. So one would have to check the other separate filings. And I thought that there's authority from the Ninth Circuit that indicates that, I think it's the Miller case, indicates that investors are not generally required to look beyond a given document. So that's my inquiry on that, following up with Judge Wynn's question.  In a more recent case after Miller, and obviously not binding in any way, Judge Oreck addressed this very issue and distinguished Miller because he said Miller would have required the plaintiffs to go and start looking through old drafts of proxies. Here, in the case that Judge Oreck was talking about, Sanchez v. Iksis, the court simply said the plaintiffs could have looked at a Bloomberg report. Here, it's even stronger because they didn't have to go out and go and look for the ISS report. The information from the ISS report was put into the mix of information. And so the total mix of information— I'm interrupting. I'm trying to make sure I understand the record here. It wasn't some of the certain unfavorable excerpts not included, and they were included in a separate SEC filing. So it would require the investors to actually search through other filings, correct? It wasn't really in this particular matter. Well, Your Honor, I would say, to be very clear, Avalar filed an additional document after the proxy was filed, because when they filed the proxy, they didn't have any information from ISS. So then they posted something to the SEC website that all the shareholders saw, in which they said, ISS supports this transaction. Then, shortly thereafter, Altair, one of the shareholders that was unhappy, posted in exactly the same way on the SEC website, information that said, actually, Glass-Lewis was strongly opposed to this, and even ISS, which supported it, was cautionary, and it expressly said it was cautionary for the following reasons, and it identified a couple of reasons. I would suggest that on two independent bases, this is sufficient. Number one, that the total mix of information available to the shareholder also includes information outside of the proxy statement. And although the Ninth Circuit has not addressed this specifically, the Fifth Circuit has addressed it, other circuits have addressed this, and Judge Oreck has addressed it, obviously, in the district court. And in fact, in Judge Oreck's case, it was not presented to the shareholders. They actually would have had to gone out and looked at an independent Bloomberg report, which was actually behind a paywall, and the court still said, it's public information, and citing some federal district court cases, both in New York and elsewhere, the rule was, in today's world, it's unrealistic to argue, and I'm quoting from that opinion, that documents available on an SEC website are not readily accessible to the investing public. But here, Altair put the mix of information in front of the shareholders. I'd like to just move on very briefly. There was one other issue that counsel didn't address, I want to address to make clear that there's no confusion. They suggest that there's some misinformation or false and misleading references, because in the proxy, Avalara talks about how the results for the quarter were below management expectations. And again, this is a true statement. As we point out on page 30 of our brief, and we cite a study about corporate managers' perspectives on forward-looking guidance, companies often put out public guidance, which tends to be conservative. It's for the investing public, and then they create expectations for their own management. This is for how they want to engage their own workforce, for bonus pools and the like. And here, the proxy, on at least six different occasions, explicitly contrasts management expectations with public guidance. It explains, for example, on page 98, SCR 98, that Avalara has historically prepared and provided certain public guidance, and we make no other public projections. And then it says, however, prospective financial information has been prepared by the management to guide the management and to guide other companies in this sale process. And then the company goes on and identifies precisely what that management guidance was in the proxy at SCR 99. And it says the revenue objective was $904 million. And so while it is certainly true that the revenue for that quarter was between $867 and $871 million, and was within the public guidance, it is equally true that it was short of the management expectations. The only way the statement in the proxy, which is the potentially actionable statement, can be deemed false is if you assume that management expectations and public guidance is always identical. And we know that that is not the case. And in fact, we even cite other cases in addition to this study, this journal, that makes that clear. So I would suggest, Your Honor, that fundamentally, what the plaintiffs are objecting to here, and they actually say this very clearly in their opening brief, they say that Avalara's company was higher valued than it was being reflected in the stock market, and that the reason it had fallen was because of macroeconomic risks. And the company shouldn't have engaged in the sale process. But ultimately, the company engaged in the sale process, and the stock ultimately was sold at a significant premium to the stock price by an overwhelming number of shareholders. Their claim that a company can't sell when macroeconomic risks have impacted the share price is essentially an assault on the business judgment rule. The question in this case is, was there anything false or misleading in the proxy? I believe that some of the statements, and I'll just finish on this, some of the statements here are actually protected by the safe harbor because they are completely forward-looking statements. For example, when they talk about partner A, they're suggesting that we shouldn't have forecast a 4% reduction based on partner A. But of course, earlier in the year, we had said partner A, if we lose it, would cost about 4%. And while we said 4% isn't that big a deal in the scheme of the company, it is certainly not false or misleading. And indeed, I think it is protected by the safe harbor to suggest that it is, in fact, a 4% drop. It would have been misleading not to say that. Essentially, you're saying that within the safe harbor provisions of 78U, that it's a meaningful cautionary statement, essentially. And there is no question. If you look at the cautionary statement here in the record, there is an extensive two or three page cautionary statement identified. But again, I would suggest that statements like the partner A loss or the risk in the future of macroeconomics or the risk in the future of reduction in compliance, those are all not only completely truthful and accurate if you want to look at it from objective falsity, but they are also forward-looking statements accompanied by very meaningful cautionary statements. If the court has no further questions, the last thing I would like to say is that here on objective, the court also reached subjective falsity. The court didn't need to reach subjective falsity. But I would say that unlike the first part of the case, the objective false statements where the standard is simply, is it plausible, the Iqbal-Chwambli standard. And I would suggest that they've actually made their claims with particularity as to those. They just haven't made them plausible. With respect to the subjective falsity, they haven't said anything with particularity. And frankly, for the judge to have made a ruling of subjective falsity as to the CEO because of a hypothetical golden parachute, which of course he didn't get, and which the plaintiffs actually say he didn't want to get. They actually say in their brief, the only reason he supported the transaction is that he wanted to hold on to his job. That doesn't give you any particularity about the state of mind to show subjective falsity. So I would suggest that although the court doesn't need to reach subjective falsity, if it affirms on objective falsity, I don't believe there's anything in the record for subjective falsity either. Thank you, your honors, for accommodating me and for the brief extension in the argument. Thank you very much, counsel. Dave O'Leary, you're welcome now. Thank you, your honor. I'll try to address some of these points as quickly as possible in the limited time left. Starting with the weakness, which was the false statement in the proxy that Q222 results fell below expectations. The district court got it wrong there because in order to rule that Q222 expectations referred to internal expectations, the court had to make an inference in defendant's favor that is not supported by the proxy or any other facts in the record. In fact, the statements that Mr. Lefkowitz read out of the proxy do not support any other results. In fact, what he read confirms that historically guidance included inorganic growth and that the only non-public guidance it referenced were the July and May projections, which again were only internal until their revelation in the proxy. There is no other expectation for the quarter, for the second quarter that is identified in any way and the court improperly drew an inference in defendant's favor to rule otherwise. With regard to inorganic growth, your honor, Mr. Lefkowitz cited quotes by Avalara management that they would no longer call out inorganic growth. They were just stating that they weren't gonna separate it out, not that they weren't going to include it in the guidance going forward. They just weren't going to say this portion of guidance is organic and this portion is inorganic, but they were still going. Also, I just want to make sure before you run out of time to get this question answered. Is there an allegation in the complaint that in prior years projections included unrealized acquisitions? Yes, your honor. Again, to go back to the point that I made earlier, which I think is- The actual projections, because I thought I heard Mr. Lefkowitz says that unrealized acquisitions are never included and have never been included in projections. Right. Well, first of all, your honor, that's a factual dispute. That's inappropriate for resolution at this point. But putting that aside, the statements that Mr. Lefkowitz cites and that defendants cite in their briefs to support the contention that only completed acquisitions had been included historically don't in fact support that contention. One of the statements said that all acquisitions were included, never stated that it was limited to completed acquisitions. It simply stated that it included completed acquisitions. And the other statement they cite to isn't talking about guidance at all, but was talking about revenue results for the quarter and revenue results that had already materialized. Your honor, just going to the upsell growth for a moment, Mr. Lefkowitz talks about slowed growth and talks about how it went from 35% in 2020 to 44% in 2021 to 25% in 2022. But it's an apples to oranges comparison because the 2020 and 2021 results were annual and the 25% growth rate in the first quarter of 2022 is therefore not comparable. It's a result for the quarter. And in fact, in the investor day presentation that talks about that growth rate, they call it healthy expansion. It can't simultaneously be strong and healthy and also weak and slow. Those two things don't exist together. With regard to the ISS statements, it was significant that defendants did not disclose that the ISS recommendation was not unequivocal, but was cautionary. As your honors correctly noted, this was not soliciting material. The Altair report was not part of the proxy. The proxy specifically told investors not to look outside of the proxy. Yes, your honor. I'm sorry to interrupt, but you're over your already extended time. And so I think you need to finish the sentence and wrap up. Yes, your honor. Thank you. I appreciate that. I just wanted to make the point quickly, as your honor stated, that the Altair report was not part of the proxy. The proxy told investors not to look elsewhere. And also that this is not a case, as Mr. Lefkowitz stated, where we're saying that a company can never sell itself in poor macroeconomic conditions, but simply that they can't mislead investors. There's a very big difference. Thank you, your honors. Thank you, counsel. That will do it for our argument. I want to say, I think both counsel on both sides of the case for the excellent arguments made. It's a complicated matter and we'll give it our attention and the parties will hear from us in due course. So thank you very much. Thank you, your honors. Thank you, your honors. And the court will now submit this case. With thanks to the parties. Thank you, your honor. Court, for this session, stands adjourned.
judges: GOULD, NGUYEN, Bennett